IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TAKEDA PHARMACEUTICALS, U.S.A., INC.,

    Plaintiff;

v.

WEST-WARD PHARMACEUTICAL CORPORATION, HIKMA AMERICAS INC., and HIKMA PHARMACEUTICALS PLC,

    Defendants.

Civil Action No. 14-1268-RGA

## MEMORANDUM OPINION

Mary W. Bourke and Daniel M. Attaway, WOMBLE BOND DICKINSON (US) LLP, Wilmington, DE; Jeffrey I. Weinberger, Ted G. Dane (argued), Heather E. Takahashi, Elizabeth L. Laughton, and Hannah L. Dubina, MUNGER, TOLLES & OLSON LLP, Los Angeles, CA; Celia R. Choy, MUNGER, TOLLES & OLSON LLP, Washington, DC; Peter A. Detre, MUNGER, TOLLES & OLSON LLP, San Francisco, CA, attorneys for Plaintiff.

Dominick T. Gattuso, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, DE; Lauren C. Tortorella, WINSTON & STRAWN LLP, Chicago, IL; Charles B. Klein and Ilan Wurman, WINSTON & STRAWN LLP, Washington, DC; Elaine H. Blais, Robert D. Carroll (argued), Lana S. Shiferman, Robyn R. Schwartz, and Louis L. Lobel, GOODWIN PROCTER LLP, Boston, MA, attorneys for Defendants.

December 12, 2018

**ANDREWS, U.S. DISTRICT JUDGE:**

Currently pending before the Court is Defendants West-Ward Pharmaceuticals, Hikma Americas, and Hikma Pharmaceuticals' Motion for Recovery of Damages on Bond. (D.I. 323). The parties have fully briefed the issues. (D.I. 324; D.I. 339; D.I. 354). The Court heard oral argument on October 16, 2018. (D.I. 409). For the following reasons, the Court GRANTS Defendants' Motion for Recovery of Damages on the Bond in the amount of $31,871,072.09.

## I. Background

Plaintiff Takeda Pharmaceuticals manufactures and markets Colcrys, a branded 0.6 mg colchicine tablet, for the treatment of gout prophylaxis and acute gout flares. In 2009, Colcrys became the only FDA-authorized colchicine product on the pharmaceutical market when the FDA removed all unauthorized colchicine products from the market. Plaintiff owns two sets of patents claiming methods of administering colchicine. One set of patents ("the Acute Gout Flare Patents") is directed to a method of treating acute gout flares with colchicine by administering 1.2 mg oral colchicine at the onset of an acute flare, followed by 0.6 mg oral colchicine one hour later. U.S. Patent No. 7,964,647 cl. 1; U.S. Patent No. 7,981,938 cl. 1. The second set of patents ("the DDI Patents") are directed to a method of treating patients by reducing the dose of colchicine when prescribed with certain other medication. U.S. Patent No. 7,964,648 abstract; U.S. Patent No. 8,097,655 abstract; U.S. Patent No. 8,440,722 abstract.

On September 26, 2014, Defendant Hikma Pharmaceuticals received FDA approval of a paper New Drug Application ("paper NDA") for Mitigare. Mitigare is a 0.6 mg colchicine capsule indicated solely for gout prophylaxis—a non-patented use of colchicine. (D.I. 324 at 8). Defendants were in the process of bringing a branded version and a generic version (Mitigare AG) to the market in early October 2014. (*Id.* at 10-11). On October 3, 2014, Plaintiff filed suit

1

against Defendants West-Ward Pharmaceuticals, Hikma Americas, and Hikma Pharmaceuticals ("Defendants") alleging that Defendants induced infringement of both the DDI Patents and the Acute Gout Flare Patents based upon Mitigare's label. (D.I. 1). The Complaint asserts United States Patent Nos. 7,964,647 ("the '647 Patent"), 7,964,648 ("the '648 Patent"), 7,981,938 ("the '938 Patent"), 8,097,655 ("the '655 Patent"), and 8,440,722 ("the '722 Patent"). (*Id.* ¶ 22).

Plaintiff filed a Motion for a Temporary Restraining Order and Preliminary Injunction on October 6, 2014, just four days before Defendants planned to launch Mitigare and Mitigare AG. (D.I. 5). Plaintiff alleged that it would be immediately and irreparably harmed if Defendants were allowed to launch their generic colchicine product, Mitigare AG. (D.I. 6 at 16). The Court entered a temporary restraining order ("TRO") on October 9, 2014, prohibiting Defendants from launching or making any preparations for a launch of Mitigare or Mitigare AG. (D.I. 21). The Court also issued an order setting a TRO bond of $13 million, but noted, "The amount of the bond does not currently reflect any harm that [Defendants] may suffer and demonstrate as a result of loss of a first-mover advantage in the marketplace. . . . [T]he issue will be addressed [at] a later time if necessary." (D.I. 72). On November 4, 2014, the Court held that the TRO had been improvidently granted and denied Plaintiff's request for a preliminary injunction. (D.I. 79). However, the Court extended the TRO during the pendency of Plaintiff's appeal from the denial of the preliminary injunction. (*Id.*). The Court also determined that the TRO bond would increase by $500,000 per day until the preliminary injunction appeal was decided. (*Id.*). The Federal Circuit affirmed the denial of the preliminary injunction and lifted the TRO on January 9, 2015. *Takeda Pharm. U.S.A., Inc. v. West-Ward Pharm. Corp.*, 785 F.3d 625, 628 (Fed. Cir. 2015). By that time, the bond had increased to $46 million. (D.I. 324 at 6).

2

After the TRO was lifted, the parties engaged in a simultaneous product launch—Defendants launched Mitigare and Mitigare AG and Plaintiff launched Colcrys AG, an authorized generic of Colcrys. (*Id.* at 10). Defendants now seek recovery under the bond. Specifically, Defendants seek the lost profits they would have achieved if not wrongfully enjoined, including from the loss of a first-mover advantage. (*Id.* at 7).

## II. Legal Standard

A party may recover a posted security where the party has "been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Rule 65 requires that a security be posted "to protect the enjoined party in the event the injunction should not have been imposed." *Howmedica Osteonics v. Zimmer, Inc.*, 461 F. App'x 192, 198 (3d Cir. 2012). "[A] party is wrongfully enjoined when it had a right all along to do what is was enjoined from doing." *Latuszewski v. VALIC Fin. Advisors, Inc.*, 393 F. App'x 962, 966 (3d Cir. 2010) (internal quotations omitted).

A party seeking recovery under the bond "must establish what damages were proximately caused by the erroneously issued injunction in order to recover and the alleged damages cannot be speculative." *Va. Plastics Co. v. Biostim Inc.*, 820 F.2d 76, 80 n.6 (3d Cir. 1987). However, "[g]iven the inherent difficulty of identifying a 'but-for-world,' [the courts] do not require that damages be measured with certainty, but rather that they be demonstrated as 'a matter of just and reasonable inference.'" *Behrend v. Comcast Corp.*, 655 F.3d 182, 203 (3d Cir. 2011), *rev'd on other grounds*, 569 U.S. 27, 35 (2013) (requiring that "damages case must be consistent with liability case"); *see also Latuszewski*, 393 F. App'x at 966-67 ("Although proof of damages on an injunction bond need not be to a mathematical certainty, a damages award cannot be speculative.") (cleaned up).

3

### III. Discussion

#### A. Recovery Under the Bond is not Premature

The parties dispute whether Defendants' motion is premature. Defendants assert that the motion "is ripe because this Court and the Federal Circuit have determined, through final adjudication, that [Defendants were] wrongfully restrained from selling its colchicine products" by the TRO. (D.I. 324 at 18). Plaintiff asserts that Third Circuit law is clear that "[n]o liability can arise on an injunction bond unless there is a final judgment in favor of the party enjoined." (D.I. 339 at 19 (quoting *Am. Bible Soc'y v. Blount*, 446 F.2d 588, 594-95 (3d. Cir. 1971))). However, at oral argument, Plaintiff conceded that the only practical reason that recovery under the bond is premature is the potential overlap between the recovery under the bond and potential infringing sales. (D.I. 409 at 45:19-46:1).

The Court has entered summary judgment in favor of Defendants on Plaintiff's claims of infringement. (D.I. 416). Therefore, "there is a final judgment in favor of the party enjoined," *Am. Bible Soc'y*, 446 F.2d at 594-95, and determination of liability is not premature.

#### B. Defendants may not Recover Damages in Excess of the Bond Amount

Defendants request recovery in excess of the bond amount. (D.I. 324 at 7). Defendants assert that "[c]ourts determine a party's obligations under a bond by looking to 'the language of the bond, the rule requiring the giving of the bond, and the terms of the injunction or other order requiring the posting of the bond.'" (*Id.* at 20 (quoting *Mercury Air Grp., Inc. v. Int'l Air Leases, Inc.*, 993 F.2d 883 (9th Cir. 1993)). Defendants contend that the order setting the bond envisioned that the damages Defendants suffered "as a result of the loss of a first-mover advantage in the marketplace" would "be addressed [at] a later time if necessary." (D.I. 72). Specifically, the Court provided that "[s]hould [Plaintiff] launch an authorized generic of

4

Colcrys within thirty days of the expiration of this order, the Court will schedule a hearing to consider further evidence regarding the appropriate amount of any increased or supplemental bond . . . and/or additional damage in excess of the aforementioned bond amount." (*Id.*).

Plaintiff responds that in the Third Circuit, "a [party] wrongfully enjoined has recourse *only* against the bond." *Sprint Commc'ns Co. v. CAT Commc'ns Int'l, Inc.*, 335 F.3d 235, 240 (3d Cir. 2003) (emphasis added). Plaintiff recognizes that there are situations where a party's liability may exceed the bond amount but argues that these exceptions are limited to situations involving bad faith or fraud in seeking the injunction. (D.I. 339 at 20 (citing *Don Post Studios, Inc. v. Cinema Secrets, Inc.*, 148 F. Supp. 2d 572, 575 (E.D. Pa. 2001))).

I agree. Wrongfully enjoined parties may *only* recover in excess of the bond where the party seeking the injunction engaged in bad faith or fraud. *See Don Post Studios*, 148 F. Supp. 2d at 575. Third Circuit law is clear that retroactively increasing the amount of an injunction bond is improper. *Sprint Commc'ns*, 335 F.3d at 240. The language of the bond and the language of the order setting the bond therefore may not improperly permit a retroactive increase of the amount of the bond. *Id.* at 241; *AstraZeneca LP v. Breath Ltd.*, 542 F. App'x 971, 982 (Fed. Cir. 2013). The purpose of an injunction bond is to provide notice to the party seeking the injunction of the potential cost and to allow the seeking party to determine whether the injunction is worth that specific risk. *Sprint Commc'ns*, 335 F.3d at 240 (Injunction bonds are intended to limit "the liability of the applicant and inform[] the applicant of the price [it] can expect to pay if the injunction was wrongfully issued."). Language in the bond order that leaves open the possibility of an unlimited retroactive increase of the bond amount after the temporary restraining order is dissolved is therefore improper and should not be given effect. Thus, Plaintiff's liability is limited to the $46 million secured by the TRO Bond.

5

## C. Judicial Estoppel

Defendants argue that the doctrine of judicial estoppel should be applied to Plaintiff's assertions in response as they contradict Plaintiff's assertions at the TRO stage. (D.I. 324 at 23-26). The doctrine of judicial estoppel prohibits "parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-51 (2001). Judicial estoppel is appropriate where the following three requirements have been met: (1) "the party to be estopped must have taken two positions that are irreconcilably inconsistent;" (2) the party must have changed position "in bad faith—i.e., with intent to play fast and loose with the court;" and (3) estoppel is "tailored to address the harm identified and no lesser sanction would adequately remedy the damage done by the litigant's misconduct." *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779-80 (3d. Cir. 2001) (internal quotations omitted).

The application of judicial estoppel is not appropriate here. While Plaintiff's positions in petitioning the Court for a TRO and in opposing Defendants' motions for recovery are inconsistent, there is no evidence that these inconsistent positions were taken in bad faith. Defendants assert that Plaintiff's factual knowledge about the circumstances of Defendants' launch of Mitigare did not differ between the time of requesting the TRO and this motion. This is not accurate. While certain factual information was known at the time of the TRO request (i.e., the BX-rating of Mitigare AG), the impact of that information was not. As acknowledged at oral argument, the Mitigare AG launch was a unique situation. (D.I. 409 at 46:20-23). Plaintiff has had the benefit of seeing how these factors influenced the real-world launch of

6

Mitigare/Mitigare AG in January 2015. Therefore, the Court will not judicially estop Plaintiff from basing its arguments on post-launch information.[1]

### D. Whether Defendants are Entitled to Damages

#### i. Lost Profits Resulting from Loss of First Mover Advantage

Defendants are entitled to their lost profits caused by the loss of its first mover advantage under the TRO. Plaintiff argues that the "but-for" world would look like the real world but shifted forward in time by three months. (D.I. 339 at 31). Therefore, under Plaintiff's theory, Defendants' lost profits are simply the profits Defendants made in the first three months after launching its product. (*Id.*). Defendants assert that the "but-for" world requires determination of multiple facts and that it is improper to calculate lost profits by merely shifting the real-world figures forward by three months. (D.I. 324 at 30). The Court finds that Defendants' model more accurately estimates Defendants' lost profits. A simultaneous launch after the Plaintiff had three months to prepare to compete with Defendants' product is not comparable to what would happen in the "but-for" world where Plaintiff would have had a delayed launch and substantially less time to determine how to compete with Defendants' product. Plaintiff also challenges the inputs Defendants have used in their model's calculation of lost profits.

Under Defendants' damages model, to determine the amount of Defendants' lost profits, the Court must ask the following questions about the "but-for" world: (1) what amount of colchicine market share would Defendants have gained if Mitigare AG launched in October 2014; (2) when would Plaintiff have launched Colcrys AG; (3) what long term market share

---

[1] There is, of course, something troubling about Plaintiff rushing into court with the declaration that the sky is falling, and then, years later, stating that it was a sunny day. I think the system acknowledges this possibility by making preliminary injunctive relief an "extraordinary" remedy and requiring the posting of a bond when such relief is given.

7

would Mitigare/Mitigare AG have secured and how quickly would Mitigare/Mitigare AG's market share have eroded to its long term market share after Colcrys AG entered the market; (4) what incremental expenses[2] Defendants would have incurred; and (5) at what price would Defendants have sold Mitigare AG.

Defendants argue that the following would have occurred in the "but-for" world: (1) Defendants would have gained 47.5% to 67% of the market share for colchicine sales when it launched Mitigare AG in October 2014 (*id.* at 33); (2) Plaintiff would not have introduced Colcrys AG until January 9, 2015 after exhausting all possibilities of removing Mitigare AG from the market or, alternatively, the earliest Plaintiff could have launched Colcrys AG in the "but-for" world was November 4, 2014 (*id.* at 12-13); (3) Defendants' market share would have eroded to a long-term market share of either 10% or 15% (*id.* at 33); (4) Defendants would not have incurred incremental expenses (*id.* at 33-34); and (5) Defendants would have sold Mitigare/Mitigare AG at a lower sales price than in the real world (D.I. 400 at 3).

Plaintiff argues that under Defendants' expert's methodology, the following would be true in the "but-for" world: (1) Defendants' market share would have been the same as the market share captured in the real-world (D.I. 339 at 25); (2) Plaintiff would have launched Colcrys AG on October 17, 2014, only eight days after Defendants' launch (*id.* at 28); (3) Defendants would not have achieved a long-term market share greater than what it has achieved in the real world (*id.* at 32); (4) Defendants would have incurred the same incremental expenses in marketing Mitigare and Mitigare AG as in the real world (*id.*); and (5) Defendants would have sold Mitigare AG at its real-world prices shifted forward in time by three months (*id.* at 26).

---

[2] "Incremental expenses" refers to the additional operating costs associated with selling Mitigare and Mitigare AG. (D.I. 403 at 3). These expenses may include manufacturing costs, promotional costs, and other operating expenses. (*Id.* at 3-4; D.I. 400 at 2).

8

The Court agrees with Plaintiff that Defendants' "input" numbers do not accurately represent what would have occurred in the "but-for" world. However, the Court also finds Plaintiff's scenario inaccurate. The following inputs are my best estimation of what would have occurred in the "but-for" world: (1) Defendants would have initially converted 30% of the colchicine market to Mitigare/Mitigare AG; (2) Plaintiff would have launched Colcrys AG on November 4, 2014; (3) Defendants' market share would have eroded at a rate of 5.175% per month over a four month period to a long term market share of 9.3%; (4) Defendants would have expended the same incremental expenses for the sales from October 2014 to January 2015 as they did in the real world; and (5) Defendants would have sold Mitigare AG at its real-world prices shifted forward in time by three months.

**First**, a thirty percent conversion rate upon Defendants' entry into the market best reflects the unique character of Mitigare AG. For Mitigare AG to gain market share as a BX-rated generic, Defendants needed prescribers to change how they wrote colchicine prescriptions to take advantage of automatic substitution at pharmacies. (D.I. 341-16 at 6-7). Moreover, many prescribers use e-prescription systems, where prescribers select the appropriate drug from a drop-down list. (D.I. 409 at 50:21-51:7). Delay in adding Mitigare AG to the drop-down list would have prevented the immediate conversion of electronic prescriptions for colchicine tablets. Defendants' own timeline estimated that it would take anywhere from two weeks to six months for Mitigare/Mitigare AG to be loaded into the e-prescription system. (D.I. 341-21 at 4). Moreover, Defendants' own pre-launch estimates contemplated a range of possibilities for the conversion rate. Defendants' "expected" market share was 30%. (D.I. 326-4 at 25). Defendants argue that their previous estimates should be disregarded in light of the initial supply orders it had received before the TRO was entered. (D.I. 354 at 9 n.7). However, the evidence shows that

9

these initial orders were for one month of stock and a quantity of safety stock. (D.I. 339 at 16-17; D.I. 342-11 at 3-4; D.I. 326-4 at 25). According to Defendants' own expert, Mr. Russell, safety stock generally covers 10-14 days of extra stock. (D.I. 325-1, Ex. 3 ¶ 86). Therefore, Defendants' initial orders only equated to 32.6% of the market share. Combined with the unique challenges that faced a BX-rated generic in the market, the Court finds that the 30% conversion rate most accurately reflects the market share Defendants would have achieved in the "but-for" world.

**Second**, in the "but-for" world, Plaintiff would have launched Colcrys AG on November 4, 2014. Defendants argue that Plaintiff would not have entered the market until after it exhausted all possibilities of removing Mitigare AG from the market. I am not convinced. Plaintiff was sensitive to doctor and patient ill will remaining from when Colcrys became the sole colchicine product on the market. (D.I. 409 at 78:16-18, 83:8-13). Plaintiff's contention that it would have launched Colcrys AG as quickly as possible once the TRO had been denied is therefore highly credible. In light of the previous ill will directed towards Plaintiff's predecessor, Plaintiff would have been wary of creating renewed or additional ill will by causing another removal of cheaper colchicine products from the market.

However, there is very little pre-TRO evidence of *when* Plaintiff would have been prepared to launch a competing generic into the market if the TRO had not been entered. The only pre-TRO evidence is Plaintiff's internal projected timeline. (D.I. 341-15 at 13). The Court has no evidence other than bare allegations that this timeline could have been met. While Plaintiff was in negotiations with Prasco (the distributor of Colcrys AG) at the time the TRO was issued, these negotiations would not have accelerated until after the TRO was denied on October 9th. (D.I. 340 ¶ 43-44). There is again no evidence other than bare contentions that these

10

negotiations would have been concluded quickly. (*Id.* ¶ 44). In contrast, there is post-TRO evidence that Plaintiff and Prasco were ready to launch Colcrys AG on November 4, 2014. (*Id.*). Plaintiff has not provided any evidence suggesting how to calculate an earlier entry date beyond its blanket assertion that it would have been motivated to enter the market sooner. Therefore, the Court finds Plaintiff would have launched Colcrys AG on November 4, 2014.

**Third**, after Plaintiff's entry, Defendants' market share would have eroded at a rate of 5.175% per month until it reached a long-term market share of 9.3%. Given the significant problems with Defendants' launch strategy as demonstrated in the real world, Defendants' market share would have eroded once Colcrys AG entered the market. Colcrys AG would have entered the market less than one month after Mitigare AG, before Mitigare AG was loaded into e-prescription systems. (D.I. 341-21 at 4). Moreover, the AB rating, greater physician familiarity with the dosage form of tablets, and the greater convenience of tablets as a dosage form would have driven the market to convert to Colcrys AG. In the real world, Defendants eventually increased their market share to 9.3% after significant marketing efforts. (D.I. 339 at 32; D.I. 325-1, Ex. 6 ¶ 105 n.201). A mere one-month head start on Plaintiff's generic product would not have significantly helped Mitigare/Mitigare AG's long-term market share. Moreover, as Defendants note, the lower conversion rate indicates significant barriers to conversion that apply in both directions—to Mitigare AG and away from it. (D.I. 408 at 3). Thus, while the erosion rate the Court has calculated is slightly less than those calculated by the parties' experts, it is consistent with the other inputs the Court has identified.

**Fourth**, the Court finds that Defendants would incur the same incremental expenses in the "but-for" world as the real world, and therefore the same profit margin, but shifted forward by three months. Defendants assert that they would not have needed to engage in marketing

11

efforts for Mitigare and Mitigare AG in the but-for world. I disagree. In the real world, it took several months for Defendants to start making significant marketing efforts after the Mitigare AG launch did not secure the targeted market share. Moreover, in the real-world, Mitigare AG did not receive favorable formulary placement by payers for more than nine months after the product launch. (D.I. 342-8 at 14). Defendants did not secure preferred formulary status until after it expanded its marketing outreach. (D.I 342-7 at 13; D.I. 342-9 at 5). Given Defendants' projections for sales, I find it unlikely that a one-month head start on the Plaintiff would eliminate Defendants' need to expend the same or similar expenses on marketing efforts.

**Fifth**, there is no evidence to support a conclusion that Defendants would have lowered the sales price for Mitigare or Mitigare AG in the but-for world. Defendants' expert Dr. Addanki used a lower price in his calculations "[t]o account for the possibility that in the but-for world, [Defendants] could have lowered [their] price in anticipation for and/or in response to" Plaintiff's launch of Colcrys AG. (D.I. 325-1, Ex. 4 ¶ 49). In contrast, Plaintiff's expert Ms. Mulhern used Mitigare AG's actual price for 2014 and 2015 sales. (*Id.* at Ex. 6, ¶ 118 & Ex. 13). In response to the Court's previous order (D.I. 398), Plaintiff now argues that the lowered price Defendants' expert used is more appropriate because Defendants could not have secured higher sales without lowering their price. (D.I. 403 at 5). The Court disagrees. Though Defendants did eventually lower the sales price in the real world, neither party has pointed to any evidence explaining *why* a one-month head start would lead Defendants to lower the sales price faster in the "but-for" world. Therefore, Defendants' lost profits should be calculated using real-world sales prices shifted forward by three months, as Plaintiff's expert calculated.

Thus, after using Defendants' expert's methodology and the inputs determined above to calculate lost profits, Defendants are entitled to recover $31,407,800 in lost profits under the Bond. (D.I. 401 at 1).[3]

### ii. Promotional Expenses

Defendants are not entitled to recover promotional expenses incurred in marketing Mitigare or Mitigare AG. The evidence shows that even in the "but-for" world Defendants would have needed to promote Mitigare and Mitigare AG to maintain its long-term market share and prevent further erosion. (D.I. 339 at 32; D.I. 342-7 at 13; D.I. 342-8 at 14; D.I. 342-9 at 5; D.I. 325-1, Ex. 6 ¶ 105 n.201). Defendants argue that if they "had been able to launch in October 2014, it would have had a typical generic launch, which does not require much marketing or promotion." (D.I. 324 at 34). However, Mitigare AG was not a typical generic, and, as Plaintiff notes, Defendants did not put together a sales force until several months after their real-world January launch. (D.I. 409 at 68:8-10). To maintain market share after Colcrys AG entered the market, Defendants would have had to engage in these same marketing efforts and the costs associated with them. Therefore, Defendants are not entitled to recover their promotional expenses and incidental costs because they were not caused by the TRO.

### iii. Costs and Prejudgment Interest

Defendants are entitled to prejudgment interest on their lost profits,[4] but are not entitled to costs. Prejudgment interest is regularly awarded to a party who has been wrongfully enjoined. *See, e.g., Par Pharmaceutical, Inc. v. TWI Pharmaceuticals, Inc.*, 2016 WL 5820211, at *6 (D.

---

[3] Defendants did not object to the accuracy of this number as calculated from the inputs determined by the Court. (D.I. 400 at 4; D.I. 408 at 4).

[4] Defendants may not receive prejudgment interest above the amount secured by the TRO bond. *Par Pharmaceutical, Inc. v. TWI Pharmaceuticals, Inc.*, 2016 WL 5820211, at *6 (D. Md. Oct. 4, 2016) (citing *Sprint Commc'ns Co.*, 335 F.3d at 240-41).

13

Md. Oct. 4, 2016). Prejudgment interest shall be calculated from the date the TRO was granted, October 9, 2014, until the date of judgment, January 9, 2015. The parties advocate for different rates of prejudgment interest. Defendants argue prejudgment interest should be set at the Delaware statutory rate, which is "determined by adding 5% to the Federal Reserve Discount Rate." *Gentile v. Rossette*, 2010 WL 3582453, at *1 (Del. Ch. Sept. 10, 2010) (citing Del. Code Ann. tit. 6 § 2301(a)). Plaintiff argues that prejudgment interest should be assessed at the treasury bill rate as set out in the statute for post-judgment interest. (D.I. 339 at 34 (citing 28 U.S.C. § 1961)).

"The rate of prejudgment interest and whether it should be compounded or uncompounded are matters left largely to the discretion of the district court. In exercising that discretion, however, the district court must be guided by the purpose of prejudgment interest . . . ." *Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed. Cir. 1986) (citations omitted) (internal quotation marks omitted). The purpose of prejudgment interest is to place the party in as good a position as it would have been absent the wrongful act. I do not find either proposed rate for prejudgment interest to be appropriate. Defendants' rate would likely result in an overcompensation, while Plaintiff's rate would result in undercompensation. In this case, the prime rate best compensates Defendants as it reflects the rate at which Defendants would most likely have been able to borrow money. The prime rate on October 9, 2014 was 3.25%. Therefore, Defendants will receive $463,272.09 in prejudgment interest.[5]

Furthermore, Defendants are not entitled to costs. Though denial of a preliminary injunction is a judgment from which an appeal lies, the Local Rules of the United States District

---

[5] This amount was calculated using a pro-rated amount of additional profits for January 1-9 of 2015 and the total additional profits calculated for October 9 through December 31 of 2014. (D.I. 401-2 at 3).

14

Court for Delaware provide that "[a] party shall, within 14 days after the time for appeal has expired or within 14 days after the issuance of the mandate of the appellate court, file a bill of costs. Failure to comply with the time limitations of this Rule shall constitute a waiver of costs ..." D. Del. L.R. 54.1(a)(1). Therefore, because Defendants have waited over three years to request costs for the preliminary injunction judgment, it has waived those costs.

## IV. Conclusion

For the foregoing reasons, the Court GRANTS Defendants' Motion to Recover Damages for Wrongful Restraint in the amount of $31,407,800 in lost profits and $463,272.09 in prejudgment interest.

An accompanying order will be entered.